Thomas Sunderland and C. J. Hillyer

*vs.*

Hallet Kilbourn, James M. Latta and J. F. Olmstead.

Equity. No. 7,764.

{ Decided July 5, 1884.
{ The Chief Justice and Justices Wylie and James sitting.

1. One cannot be agent for the purchaser and agent for the seller at the same time. The duties are incompatible and a contract for such employment is utterly void.

2. A contract may be illegal and void in part as against public policy and yet good as to the residue.

3. K. & L., a firm of real estate agents, were employed by S. and H. to make purchases of real estate. Under the contract, if the property was accepted at the price submitted, K. & L. were to be paid a commission on the purchase price. At the time of, and some time before, entering into the contract, K. & L. held the refusal of a piece of property at $40,000. After the contract was entered into K. & L. took the money deposited with them by S. and H. and purchased it for themselves, and then, without making known to S. and H. that they were really the owners of the property, submitted it to them at $65,000. The latter accepted it at that price, and the conveyance was accordingly made. S. and H. subsequently discovered the real facts, and claimed the benefit of the purchase at $40,000. But it was *held* that K. & L. were under no obligations to give S. and H. the benefit of a contract of refusal entered into before their contract with them. That the remedy of the latter was to repudiate their contract if imposition had been practiced by a concealment of facts ; but they could not retain the property and recover the $25,000 in addition.

4. And where in another transaction under the contract a return of part of the purchase money was claimed on the ground that K. & L. had defrauded the vendors of it, it was *held* that even if the vendors had been defrauded

as alleged, this fact did not entitle S. and H. to receive the benefit of it.

5. But where K. & L., acting under the contract, purchased a piece of property at 40 cents a foot and turned it over to S. and H. at 50 cents, at which price the letter agreed to take it, it was *held* that K. & L. were accountable to them for the difference.

6. Facts considered which entitle agents to compensation for the care and management of property in their charge, and the measure thereof fixed by the court in view of the circumstances of the case.

7. Cases of fraud, trust and account, are within the jurisdiction of courts of equity. Section 723 of the Revised Statutes, which declares that the courts of the United States shall not exercise jurisdiction where a remedy exists at law, only emphasizes a doctrine which existed before the passage of the statute.

BILL IN EQUITY for an account.

THE CASE is stated in the opinion.

J. H. RALSTON and JOHN SELDEN for complainants.

ENOCH TOTTEN and SHELLABARGER & WILSON for defendants:

First. In this case there is a plain, adequate and complete remedy at law. "Suits in equity shall not be sustained in either of the courts of the United States in any case where a plain, adequate and complete remedy may be had at law." R. S., sec. 723.

There is not one of the items of the claim in this bill which involves a question of trust, an unadjusted account, nor the necessity of a discovery. The entire controversy could be much more readily settled in an action at law than an equity proceeding. Heine *vs.* The Levee Com'rs, 1 Wood, 246; Fowle *vs.* Lawrason, 5 Pet., 503; Sadler *vs.* Robinson, 2 Stew., 520; Ins. Co. *vs.* Stanchfield, 1 Dill, 425; Russ *vs.* Wilson, 22 Me., 207; Crooker *vs.* Rogers, 58 Me., 339; Law *vs.* Thorndyke, 20 Pick., 317; Youngblood *vs.* Youngblood, 54 Ala., 486; Russell *vs.* Little, 28 Ala., 160; Woodman *vs.* Freeman, 25 Me., 531; Bridge Co. *vs.* Van Etten, 36 Mich., 210; Murphy *vs.* Barron, 1 H. & G., 258; Casey *vs.* Centiss, 3 How., 255; Ins. Co. *vs.* Hill, 60 Me., 183; Suter *vs.* Matthews, 115 Mass., 253; Grand Chute *vs.* Weninger, 16 Wall., 374; Moore *vs.* Middlebaum, 8 Mich., 433; Adair *vs.* Wariherta, 7 G. & J., 114; Ashley *vs.* Denton, 1

Lit., 86; Scott *vs.* R. R. Co., 34 N. J. Eq., 354; Wright *vs.* Butler, 6 Wend., 284; Cope *vs.* Wheeler, 41 N. J., 303.

Second. The complainants say that they made a bargain by which the defendants agreed to act as their agents and brokers, to purchase for the complainants real estate, and with the fraudulent provision that if they could not succeed in deluding their customers and other sellers into the belief that they, the defendants, were their agents, then in that event, these complainants would pay the defendants for their services rendered in that behalf. But if these sellers could be cheated into paying commissions then the complainants were to pay nothing. Such a contract is not only a gross violation of every rule of morality, but also of the plain rules of law, as they have been declared in judicial decisions from time immemorial.

The defendants, in their several answers and in their testimony, positively and absolutely deny that any such agreement was ever made or thought of by any one of them. But even if such contract was made it is void, because it is inconsistent with public policy. A double agency of a real estate agent or broker involves inconsistent duties, and it is clear, upon both principle and authority, that in case of such double employment, the contract is void. It has been doubted whether such double agency, made even with the consent of both buyer and seller, can be upheld on the ground of public policy. See Myer *vs.* Hanchett, 43 Wis., 246; Raisin *vs.* Clark, 41 Md., 158. That such double agencies are void when the employment is concealed from one of the principals, there can be no doubt. Story on Agency, secs. 9, 11, 195, 210, 241; Ringo *vs.* Binns, 10 Pet., 269. Am. Law Reg., 61 (January, 1876); Rupp *vs.* Sampson, 16 Gray, 398; Stewart *vs.* Mather, 32 Wis., 355; Meyer *vs.* Hanchett, 39 Wis., 419; Farensworth *vs.* Hemmer, 1 Allen, 494; Walker *vs.* Osgood, 98 Mass., 348; Ballman *vs.* Loomis, 41 Conn., 581; Ernhart *vs.* Searle, 71 Pa. St., 256; Lloyd *vs.* Colston, 5 Bush., 587; Shirlaw *vs.* Monitor Iron Works, 41 Wis., 162; 1 Lead. Cases in Equity, 250, and authorities there cited; Marye *vs.* Strouse, 6 Sawyer, 204; Michaud *vs.*

Girod, 4 How., 503; Connelly vs. Bond, 34 Barb., 276; 4 Kent Com., 7 ed., 475; Bell vs. McConnell, 37 Ohio St., 395.

Third. The complainants are too late in making their complaints, and this is true of both branches of the case.

The last purchase of real estate was made June 19, 1872. The bill was filed June 9, 1881, nearly nine years after the acts complained of. To avoid the defence of a stale claim, the complainants say they did not discover the alleged fraud until recently, when they examined the deeds. These deeds were recorded October, 1872. They are bound by the knowledge which the records of these deeds disclosed. See Brant vs. Coal Co., 93 U. S., 326; Board of Comm'rs vs. R. R. Co., 18 Fed. R., 209; S. C., 4th McCreary; Sullivan vs. Portland, 94 U. S., 806.

The firm was dissolved December 31, 1876, and mutual settlement had been made amongst the members, money paid over, property transferred, and, in fact, in many respects, the positions of all the defendants has been changed to such a degree as to render the defence of laches a most just and equitable one.

Fourth. Between merchants at home, an account which has been presented, and no objection made thereto after the lapse of several posts, is treated, under ordinary circumstances, as being by acquiescence a stated account. 1 Story's Eq., 520–526; Wiggins vs. Burkham, 10 Wall., 129; Chappedelaine vs. Decheneaux, 4 Cr., 306; Freeland vs. Heron, 7 Cr., 147; Lockwood vs. Thorne, 11 N. Y., 170; Baker vs. Biddle, 1 Bald., 418; Hopkirk vs. Page, 2 Marsh., 29; White vs. Macon, 3 Cr. C. C., 250. And the account need not be signed by the parties; it is enough that it shows a balance, or that there is none. Baker vs. Biddle, 1 Bald., 418; Bainbridge vs. Wilcocks, 1 Bald., 539.

The rule that delay in objecting to an account stated will be deemed an acquiescence, applies to corporations. Bradley vs. Richardson, 2 Blatch., 354.

" Where a broker's pass book is made up of debits and credits, and a customer has had a fair opportunity to see how his account stands, the balances struck will be regarded as

accounts stated; and after an apparent acquiescence, the customer will not be heard to plead ignorance of the facts." Marye *vs.* Strouse, 6 Saw., 209.

If a merchant neglects, after a reasonable time, to object to an account rendered by his factor, showing sales at a price below that at which the factor was authorized to sell, he is deemed to acquiesce in it; and it is treated as a stated account. Richmond Manfg. Co. *vs.* Starks, 4 Mason, 297.

Fifth. After this "account stated" h d been prepared, and, on the 26th of November, 1877, forwarded to the complainants, and by them retained, without objection, for nearly a year, they, on the 10th day of September, 1878, received the balance shown to be due them by that "account stated," to wit, $2,715.58, in full discharge and release of the defendants, Kilbourn and Olmstead. This concludes them. See Vedder *vs.* Vedder, 1 Denis, 260; U. S. *vs.* Childs, 12 Wall., 242.

Sixth. Stewart was a partner during all the time the purchases complained of were progressing, and he is interested in proportion to his share in the speculation. His sale of the property did not carry with it the claim based on the misconduct of the defendant, if any there was; such a claim cannot be assigned.

The objection of want of parties is taken in the pleadings. The absence of a necessary party is fatal, and the bill must be dismissed. See Alexander *vs.* Homer, 1 McCreary, 634; Milroy *vs.* Storkwell, 1 Carter, 35; Robertson *vs.* Carson, 19 Wall., 95.

Mr. Justice WYLIE delivered the opinion of the court.

This is a controversy which grew out of the employment of the firm of Kilbourn & Latta by Messrs. Sunderland and Hillyer and William M. Stewart, in the year 1872, for the purpose of buying property in the northwestern section of the city on speculation. The operations of Kilbourn & Latta under this agreement were pretty extensive. The principals, Sunderland, Hillyer and Stewart, were here in Washington in the months of May and June, perhaps later,

in 1872. Within a period of five or six weeks these gentlemen, through their agents, Kilbourn & Latta, purchased property in that section of the city amounting to about $600,000. Mr. Sunderland's interest in these purchases was one-half. Mr. Hillyer was to have one-quarter and Mr. Stewart was to have one-quarter interest. Soon afterwards, and in the same year, Mr. Stewart sold out his interests to Mr. Sunderland, so that a much larger interest in all these purchases was then vested in Sunderland. Besides that, Sunderland made some purchases for himself, in the same way, amounting to about $150,000.

The bill in this case charges, first, that the agents were guilty of fraud in purchasing or securing bargains at one price and reporting to their principals at another price, and taking the difference. Secondly, they claim that the defendants, their agents, charged their principals with a large amount of commissions for the care and management of the property purchased, which commissions they aver were not earned.

Although the period covered by these transactions was a brief one, yet large purchases were made, the number was, I think, about 31 or 32 in all. The only subject about which there has been any controversy between the parties is in regard to four of these purchases, two squares and some lots. As to all the others there has been no controversy at all, except as to the charge for commissions and management.

Now, as to these four purchases the bill charges that these agents purchased square 115 for $40,000, and charged the principals $65,000, making a profit of $25,000. They also charge that on square 155 there was a profit made in the same way of $5,319.55. On lot 17, in square 158, they charge that a profit was made in the same way of $3,316; and on three other lots or parts of lots in the same square a similar profit was made of $2,663.70; and on square 156 a profit of $14,601. These sums amount in all to about $50,000.

It is important to inquire what kind of a contract this was. The bill sets out that there was a special agreement,

and specifies the terms of the agreement. The defendants in their answer deny that there was any special agreement, and assert only general employment. But this feature of the case can be illustrated best by reading the evidence of Mr. Stewart in regard to the nature of the employment and the character of the agreement, and the bill seems to intimate that the agreement was as has been proved by Mr. Stewart. Mr. Stewart was one of the original parties, and he says: "On consultation among ourselves, Messrs. Sunderland and Hillyer and I, we came to the conclusion that Kilbourn & Latta should be employed to negotiate the purchase we contemplated, and accordingly we consulted with and employed them in the business. It was distinctly understood that they should negotiate for such pieces of property as we desired to purchase from time to time, and buy the same at the lowest possible price, and that they were to have a commission on all purchases made by them, but that in case the vendor should apply to them to sell, that they should obtain a reduction from the purchase price of the commission which the vendor in such case would be liable to pay, and in that case it would be the same to us as if we paid no commission."

And, on cross-examination, he says: "The exact terms of the agreement were, as near as I can recollect, that the firm of Kilbourn & Latta were to undertake to purchase such pieces of property as we might desire to purchase, and charge a commission therefor in each case. But in a case where the vendors sought them (that is Kilbourn & Latta), and in which case they were entitled to charge a commission as against the vendors, that the same should be deducted from the purchase price."

We think that such a contract as that was utterly void— wholly illegal. If Kilbourn & Latta under that contract had performed their duty faithfully to their employers (in this instance Sunderland, Hillyer and Stewart), it involved their betrayal of the other side. Sunderland, Hillyer & Co. were to select the pieces of property, and then Kilbourn & Latta were to sell, or procure authority to sell, the same

property to them at the lowest possible price; whereas it was their duty, if they were employed to sell, to get the highest possible price.

So that the arrangement between these parties was to do an illegal thing. Of course no contract of that kind can be sustained in a court of equity. The principle on which the rule here laid down depends is, as stated by Chief Justice Wilmot, the public good. I read for convenience from Broom's Legal Maxims, page 738.

"The objection," says Lord Mansfield, "that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed, but it is founded in general principles of policy which the defendant has the advantage of contrary to the real justice as between him and the plaintiff—by accident, if I may so say. The principle of public policy is this: *ex dolo malo non oritur actio.* No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appear to arise *ex turpi causa,* or the transgression of a positive law of this country, there the court says he has no right to be assisted. It is upon that ground that the court goes, not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So, if the plaintiff and the defendant were to change sides, and the defendant were to bring his action against the plaintiff, the latter would then have the advantage of it, for where both are equal in fault, *potior est conditio defendentis.*"

The court will never support a contract by which one party agrees to betray his duty to his employers, and thus we regard this contract as proved by Mr. Stewart. The same thing is proved by Mr. Hillyer and Mr. Sunderland, but is not stated with quite so much distinctness. The contract is set out rather more definitely in the bill, as of the same character; that is, where commissions could be

obtained from the other side, the selling side, there the purchasing side was not to pay.

We regard, then, this contract as set out in the bill, and more distinctly proved by the evidence, as immoral, contrary to public policy, calculated to create a breach of faith between these defendants and the sellers of the property, calculated to make it their interest to seek authority in the owners of the property to sell their property at the lowest possible price, when the law imposes the duty of obtaining for their employers the highest possible price.

A man cannot be both buyer and seller. He cannot be agent for the purchaser and agent for the seller at the same time. The duties are incompatible, and a contract for such employment is utterly void.

As we said before, there were thirty odd purchases made. How many of those purchases were made from sellers and for the lowest price, we do not know; it is not in proof here, and it is not our duty to investigate that subject. But as to these four particular pieces of property, we are of opinion that they do not fall within this unlawful contract.

Now, this contract, as we have described it, was a general contract in substance, but according to the contract, each purchase was to be a distinct purchase. These gentlemen were to designate to Kilbourn & Latta what property they wanted to buy, and then Kilbourn & Latta were to go and make the purchase. Each purchase, therefore, should occur by itself. Purchases were made at different times, the property was different, the parties were different. One purchase, therefore, might be good, whilst others might not be good; that is, under this contract.

There undoubtedly was a general employment of Kilbourn & Latta for their agency in this business under a contract which was objectionable in the feature we have pointed out. But if there were purchases made, and fairly made, which did not fall within the immoral terms of this contract, we think that such purchases may be sustained, and the claim for compensation might be allowed. For example, if Kilbourn & Latta were not employed to sell in any instance

by the owner of the property, or if they were the owners of a piece of property themselves, and sold to the other party with their eyes open, that would be a purchase and sale which does not fall within the objectionable terms of the contract. Wherever there is a transaction of that kind, a fair and honest transaction, the court will sustain it. Reading further upon that subject from Broom's Legal Maxims, page 741, it is said:

"It must be observed, however, that a contract, although illegal and void as to part, will not necessarily be void *in toto*. Thus, if there be a bond with condition to do several things, some of which are agreeable to law and some against the common law, the bond shall be good as to the former and void as to the latter only; and this rule is generally true with respect to a contract void and illegal in part as against public policy, and yet good as to the residue."

Now, although we have deemed it our duty to express our reprobation of this character of contracts, yet we think that some of the subjects of controversy in this case do not fall within the objectionable provision of this contract.

As to square 115, the first square on which a profit of $25,000 was made, the facts, in brief, were these: Kilbourn & Latta had been in negotiation for the purchase of this square for about two years themselves, and had obtained (in the winter, I think it was in January or February, 1872,) the refusal from the owners at $40,000. It was a square of ground which belonged to the trustees of a public institution. The trustees passed a resolution on their minutes recognizing the offer and accepting it at $40,000. Kilbourn & Latta had not closed their contract when they entered into the arrangement with Sunderland, Hillyer and Stewart. But soon after, or it may be said simultaneously with making this arrangement with these gentlemen, they completed the purchase and they took the money which Sunderland and Hillyer had deposited with them, and completed the purchase at $40,000, and then turned it over or submitted it to Sunderland, Hillyer and Stewart, to say whether they would take it at $65,000 or not, without informing them what it

had cost them, or who were its owners. Sunderland, Hillyer and Stewart decided to take it at $65,000. They judged for themselves. They had selected it beforehand, and they agreed to take it.

. The claim of this bill is, that, under this agreement, Kilbourn & Latta ought to have turned that property over to these purchasers at $40,000. We do not think so. They judged for themselves whether it was worth $65,000. It was the property, substantially, of Kilbourn & Latta. They had had the refusal of it, and an interest in it to that extent, long before they had seen Sunderland and Hillyer, and in fact had been in negotiation for it for several years, and they were entitled themselves to the benefit of their bargain. They were not obliged by this contract to give these gentlemen the benefit of a bargain which they had previously made for this property. That would have been a very disadvantageous contract to them. They would lose $25,000 by such a bargain as that, and all they would make would be commissions on selling $40,000 worth of property. The law does not require any such extravagance of purity. It is very true that Kilbourn & Latta concealed the fact that they had this bargain, and that they were really the owners of the property. They ought in good faith to have told the whole truth.

But what would be the consequence of that? Why Sunderland and Hillyer, if they had any fault to find with the property, if they had been imposed upon by the concealment, might have repudiated the purchase. They would have said : "Why, here, we have been imposed upon. You concealed an important fact. You were our agents, and you ought to have told us *you* were selling this property." But they did not take that course. The property was a valuable purchase and they kept it.

By what principle of law do they claim, then, that they, who employed Kilbourn & Latta in the month of May, 1872, shall have the benefit of a contract which Kilbourn & Latta had secured for themselves months before? This contract does not give them any such right. The only objection to

it in the world is the one which we have mentioned, and that is, that in making this sale to Sunderland and Hillyer, they did not inform them that they were selling for themselves. If they were imposed upon in that way, they could easily have repudiated the purchase.

Well, how is a court to make an allowance in a case of that kind and keep the contract, where they keep the property and make a profit out of the property, because they refuse to give it up? 'Why should they be allowed, then, to inflict a loss of $25,000 upon their agents? We do not think that the principles of equity have reached quite so sublime a degree of purity as that, and we therefore conclude that the complainants are not entitled to this $25,000. We think it is fairly the property of Kilbourn & Latta.

Then there is a claim for profit on square 156 of $14,601, with interest. That was a purchase made by the firm of Kilbourn & Latta from Mr. Kilbourn, trustee of the real estate association. There was a real estate association here in Washington for the purchase of property, which had been established several years. A number of gentlemen had invested their money, and the head managers of the syndicate were Messrs. Kilbourn & Latta, and Mr. Kilbourn, a member of that firm, was the trustee in whose name these purchases were vested for the use of the members of the syndicate. This firm had purchased this square some time before, and the title was vested in Kilbourn, as trustee for the syndicate, and this square was sold by Mr. Kilbourn to these gentlemen, Sunderland and Hillyer, and Sunderland and Hillyer claim that they ought to have had that square at the same price that the syndicate had bought it for several years before. In the course of the evidence, they give as their reason (which we think does not belong to this case at all) the conduct of Mr. Kilbourn and of Mr. Latta toward these gentlemen who were in that syndicate, for the purpose of showing that Kilbourn & Latta had defrauded those who had employed them. We think that that investigation does not belong to this case, but that the same principle which applied to square 115 applies also to this square 156;

that the legal title was in Kilbourn for the benefit of this syndicate, who had put money into the hands of Kilbourn & Latta for the purchase of this property, and that if Mr. Kilbourn, or Kilbourn & Latta, defrauded the syndicate, those frauds are not to be applied to the benefit of the plaintiffs in this suit. So that we think this $14,601 does not belong to these plaintiffs. That makes about $40,000 of this claim disposed of.

Another claim is profit on square 155 amounting to $5,319.55. Without going much into detail with regard to that I will say that after that square had been selected by these gentlemen as a desirable piece of land to purchase, and Kilbourn and Latta were authorized to purchase it, they bought it for themselves—substantially for themselves, and this was the profit they made upon it in turning it over to these complainants. We think that that property ought to be accounted for. Good faith must be preserved by all agents, and these defendants had no right to buy or sell for anybody; they were merely employed as agents to negotiate. But when their employers pointed out the property which they desired to buy, good faith required that they should exert their best abilities for the purpose of purchasing it for them on the best terms they could. They had no right to go and buy it for themselves and make a profit from their employers out of it. This claim we think therefore is to be allowed.

Then there is the profit on lot 17 and on two or three other lots in square 158—lot 17, one-half of 9, 10 and one other lot; we think that those profits ought to be accounted for also. In regard to lot 17 there was this feature: The plaintiffs pointed out square 158 and said, "we are willing to give 50 cents a foot for any property you can get in that square." Kilbourn and Latta then set to work and they bought some lots in that square at forty cents and charged the complainants fifty cents. That they had no right to do. The profit of the purchase belonged to the employers. They were acting in the purchase for them, and whatever profit was made belonged to them. An agent is not to be encour-

aged in devices to make profits secretly out of the business in which he is engaged as against his employer. The profits of his employment belong to his employer. Good faith and public policy require a strict enforcement of this rule. These allowances should be made with interest.

We come, now, to a difficult feature of the case produced by a stipulation which has been filed in the cause. It is dated the 22d of March, 1882, and, in substance, it is an agreement by all the parties that the court is to render such decree for or against any or either of them as the evidence warrants. The firm of Kilbourn & Latta had been dissolved at the close of the year 1876, and Mr. Latta had gone to the west and the complainants in this case brought suit in equity against him out there in regard to these transactions. After the dissolution of the firm he had taken the care and management of this property and the others had not. He had received certain sums and the others had received certain other sums from the profits of this agency, and from the money with which they had been entrusted. He had rendered a certain class of services with regard to this property after that in which they had not participated, and in addition to the other questions in the case there is the question of the apportionment of his liability to these complainants arising out of the dissolution of the partnership.

To the suit which was brought there he filed his answer. All parties, the complainants and the defendants, were anxious to have but one litigation, and the result was that the western suit was brought here and a copy of the answer and the other proceedings in that case were filed with these, and this stipulation was entered into, that the court was to render such decree for or against any or either of the parties as the evidence warrants

We hesitated a little about acting under such a stipulation. Evidence without allegation is of no consequence either in a court of equity or a court of law, and this bill was not framed with a view to this other litigation going on in the west; indeed the western litigation sprang up af-

ter this bill was filed, but the stipulation covers everything, and it is our purpose to .try to carry out the objects of the parties.

This business began, as we have said, in June, 1872. The management of the business remained in the hands of Kilbourn & Latta up to and until the close of 1876. It was then transferred to Mr. Latta, who went out of the firm to a great extent, and these gentlemen are severally claiming compensation for their services in the management of the property. It will be remembered that these were purchases for speculation; not for private use. Kilbourn & Latta were the agents to carry on the speculation, and the title to the purchases was taken in the name of Mr. Latta, one of the members of the firm, in order to the more convenient management of the business. In these purchases one-quarter to one-third was paid in cash, and the notes of Mr. Latta were given for the deferred payments, or the encumbrances were assumed by him.

Soon after these purchases, which were made in 1872, came the business panic of 1873, which overspread the whole country, reducing the value of property everywhere. This property accordingly sank in value, and the correspondence in evidence shows that Mr. Sunderland, who was most largely interested in the property, and Mr. Hillyer, too, were almost ready to give up and lose their cash investments and let the property go, rather than meet the deferred payments. At any rate that was their intimation, and there is some evidence on that subject. Certain it is that the speculation at that time seemed to have turned in the wrong direction; it was a losing operation. But Kilbourn & Latta kept the property. They watched it; they paid the taxes upon it; they took care of these deferred payments (to be sure the complainants furnished the money), until towards the end, when it became necessary to raise a loan, I think, of $35,000, and furnish security to pay that loan. We think for the persistence, pluck, determination and confidence shown by these agents during those disastrous years they ought to be well compensated. If this property had been in the hands of

its owners they undoubtedly, from the evidence we have, would have let it go and have lost their cash payments. But Kilbourn & Latta were always sanguine of the result ultimately, and they encouraged these men to hold on, and took care of the property, watched the assessments and took care of the deferred payments. Hillyer and Sunderland, the principal men, were absent in Europe a great part of the time. Stewart had sold out and had no longer any interest. We think they ought to be paid.

Now, the contract upon which this suit was brought contemplated that they should be paid out of the sales of the property that were made. That is the, contract contemplated that Kilbourn & Latta should keep the management of the property until sales could be made. But in July, 1878, Hillyer and Sunderland came here. There never had been a settlement between these gentlemen. Here was $600,000 or more of property and large sums of money deposited in the hands of agents, and large sums paid out, and there were a thousand items and no settlement. But in 1878 they demanded an account, and Kilbourn & Latta furnished them an account, and in that account they charged $16,526.67 for the care and management of the property for about four years and after, as they claim. That was whilst it remained in the care of the old firm of Kilbourn & Latta before Mr. Latta went out. Besides that, Mr. Latta, after he went out, made a claim for care and management amounting to $5,677.85, and besides that used a sum of money belonging to the complainants amounting to $1,235.79. We think that though these services were valuable, this claim is too large, and to show that it is too large we refer to the account kept by Kilbourn & Latta with Sunderland. Under date of December 12, 1876, is the item, "care and management of whole property from May, 1872, to date"—that was during the whole period of it, and it is care and management, not only of Sunderland's interest, but of the whole property—"$5,973.33." That was the value which they put upon their services in their settlement with Mr. Sunderland, and it is very strong evidence against

them. To be sure it is not an admission by which they are absolutely bound, and we do not propose to hold them to that. But we think, in the face of their own admission on that account, that an allowance of one-half of this $16,526.67 would be ample compensation to the old firm of Kilbourn & Latta, and we make them that allowance of $8,263.33½.

In regard to Mr. Latta's charge of $5,677.85 for his management, of we divide that in the same way. We allow him one-half, and we charge him, also, with the $1,235.79 which he undoubtedly used.

[His honor then went on to consider several other items of charge, but as the disposition of them involved only the consideration of questions of fact, that portion of the opinion is omitted. Concluding, he said:]

I am authorized to say for the Chief Justice that if he were present he would not concur in the conclusions we have reached. In his opinion this court has no jurisdiction. He thought that it was a case that belonged to a court of law. My brother James and myself think that it is a clear case for a court of equity; that it is a case of fraud, a case of trust, a case of account. There is an act of Congress (sec. 723, R. S.) which declares that courts of the United States sitting in equity shall not exercise jurisdiction where there is a remedy at law. The Supreme Court of the United States has put a construction upon that act, and it says that it adds nothing at all to the doctrine which existed before the passage of the act—that the statute merely emphasizes the principle. But, however emphatically that doctrine may have been declared in the act of Congress, we think that this is so clear a case for the jurisdiction of a court of chancery that we have not hesitated a moment in regard to the subject.

Mr. Justice James said:

I will add one or two concurrent expressions in regard to some of the features of this case. First, it is alleged that the whole of these transactions were provided for in the preliminary general agreement; that the plaintiffs were to

employ the defendants on a large scale and were to have their services, no matter what the transactions should be. That is to say, that if they were already employed by other people to make sales, yet, if they desired to ·purchase that same land, the defendants should be under some kind of obligation to them as their agents. My brother Wylie has, with emphasis, characterized the immoral effect of that kind of arrangement, and in that I entirely concur. So far as it constituted an engagement that the defendants should be under obligations to them in their purchases from the defendant's employers, it is not permissible. But it has occurred to me to say that I have had, in the first place, some doubt of the establishment of that contract. It was denied by the defendants, and there was a certain degree of improbability, perhaps a good deal of improbability, that men who were engaged in the business of real estate brokerage would commit themselves to so unprofitable an obligation. But besides that, I have the impression that that contract was not binding. I do not see any mutuality in it. It was said that these gentlemen were to be compensated ultimately by their commissions in selling property on speculation. First, they were to have commissions directly from the plaintiffs where they were not already employed by other people, in which case their compensation would be from the latter. But as to this general agreement it ought to have been shown that there was a preliminary obligation assumed before a single purchase was made if that contract is to be enforced and applied. But here the plaintiffs were not bound after making a single transaction to go on, they were not bound to continue. It was not a contract in which on one side they bound themselves to make purchases to a certain extent, or to some indefinitely large extent, in consideration of which obligation the others were to serve them in this way. They were not bound to buy a dollar's worth for that matter; they could stop at any time. There were 31 or 32 transactions and they could have stopped at any of them—and this appears on the face of the contract. So that there seems to have been no obligation assumed on

the part of these complainants to do anything. If that is so there were no mutual obligations. So that the alleged obligation, said to have been assumed before the purchases commenced on the part of Kilbourn & Latta, was not made binding by a consideration of obligation on the other side..

If there were no such preliminary agreement, namely, that in every transaction the defendants were to be the agents of the complainants, then what would be the character of the transaction in square 115? It would be simply this, and you will find in it nothing that will support the complainant's claim that the complainants undertook to buy this square 115. But that would not preclude the defendants from selling their own property. If, however, it involved an obligation, as I think it did, on the part of the defendants to disclose that they were acting as principals, it would still be necessary to ascertain what the injury was. The complainants would have to establish some damage that they had suffered. Without the help of this general preliminary contract, they could not insist, it seems to me, that on discovering that the defendants had bargained for that property, that bargain must be understood to have been made for them. If they had no preliminary agreement which was binding, it was reducible to this, that after these defendants had made the bargain for square 115, the complainant undertook to purchase through them. They were not informed, though, that those whom they undoubtedly regarded as their agents were themselves the principals. It is difficult to see where the damage lay in that case. They took it at their own price, the price which was reported to them. It is not demonstrated that they paid any more than they would have paid if they had known who was the owner. But after that occurred, if they had a right to complain, then it seems to me clear, as has already been stated in the opinion of the court, their remedy lay simply in throwing up the bargain. There is a principle in the law that a party cannot hold on to a contract, or insist upon its being carried out, as they did, by retaining the fruits of it, and have damages for the

breach of it; in other words, treat it as a contract fulfilled and as a contract broken.

With regard to these other cases, in which they were told that the plaintiffs would give 50 cents a foot for whatever lots could be obtained in square 158, I think it ought to be very distinctly understood that this court will not sustain any such construction as has been put upon that matter by the defendants. In the argument it was said to us that, substantially, the plaintiffs said to Kilbourn & Latta, "we will give you 50 cents for anything you can get." They did no such thing. There is not such a word in the evidence. They did not say, "we will give *you* 50 cents for anything you can get." There was a colloquy at the bar upon this subject, basing it all on that phrase. They simply said, "we will give 50 cents for whatever you get;" and they did not mean that they would give 50 cents absolutely, but that that was their limit, and one of the defendants said that they regarded this as an open order, in which case the broker takes care of himself. Well, he cannot do it in this court. We do not allow him to take care of himself. He knows perfectly well that he is employed by the purchaser when he is not already acting for the seller. The price, the limit named, is 50 cents, and when he makes the negotiation, he is obliged to regard himself as making that negotiation for his principal, the purchaser. In that case he had already one principal, namely, the purchaser, and he could not act for another. I do not care what the view taken by brokers is; it is time they should find out the view of courts of equity, and the view of the law, that when so employed they are to act simply for the principal, and it is not for them to take care of themselves. There is the most emphatic reason for holding them liable in that part of the matter.